**BOOTH, Plaintiff-Appellee, v. KROUSE, Defendant-Appellant.**

Ohio Appeals, Second District, Montgomery County.

No. 1868. Decided January 3, 1946.

Irvin Carl Delscamp, Dayton, for plaintiff-appellee.
Hon. Mason Douglass, Dayton, for defendant-appellant.

## OPINION

By HORNBECK, P. J.

This is an appeal on questions of law from a judgment of the Common Pleas Court in favor of plaintiff and against the defendant in the sum of $7500.00 and costs. The action is for alienation of affections and upon issue joined the cause was submitted to a jury which returned a verdict for the plaintiff in the sum of $15,000. Upon motion for new trial the trial

judge found the verdict to be excessive and ordered a remittitur in the sum of $7500.00 which the plaintiff accepted and judgment was entered on the verdict accordingly and motion for new trial was overruled.

There are nine errors assigned but the brief of appellant is devoted to argument under three headings—

1. The judgment of the court.

2. The size of the verdict indicates passion and prejudice.

3. Misconduct of counsel for plaintiff in argument to the jury.

We will, in general, follow the order adopted in the brief of plaintiff in the consideration of the questions presented.

We state enough of the operative facts as are necessary to an appreciation of the legal propositions involved upon the errors discussed in the briefs and, particularly, as they reflect upon the correctness of the judgment and the amount thereof.

The Booths were married Jan. 11, 1919. Mr. Booth was of an inventive turn of mind and throughout the years prior to his coming to Dayton had followed the course of many inventors, the results of which had not been especially lucrative. The plaintiff was more fortunately situated financially in that her parents were able to and at times during their married life did assist the parties in meeting their necessary expenses. The parties lived together at several places throughout the United States. For several years prior to the institution of the action herein they had lived at Glencoe, Illinois, in the family home of plaintiff's parents whence they had moved upon the death of plaintiff's mother. Plaintiff met her obligations as a wife and did the household work herself, including cleaning, washing, ironing, cooking and at times cared for one or more boarders and roomers who were associated with the husband in his experimental ventures. At one time for several months there were three such persons living with the parties. The husband converted a barn on the premises where the parties lived, into a shop and completely equipped it with machinery. To accomplish this, plaintiff's father assisted him financially.

In July, 1941, the husband took employment at Dayton, Ohio, as a consulting aeronautical engineer with United Aircraft Products Co. and was in this employment at the time of the trial of the cause.

The record is comprehensive and voluminous respecting the experiences of the Booths during their married life as they would reflect upon the husband's affection for his wife,

and the conduct of defendant and Mr. Booth and his movements during the period after he came to Dayton.

It appears that defendant met Mr. Booth in July, 1942, and thereafter until after the suit was instituted these parties were together quite frequently uninterrupted by any lengthy intervals. They met socially at homes of their friends, at the apartment of each and took trips to cities and eating places outside Dayton. Eventually in June, 1943, Mr. Booth went to the home of the defendant to take his breakfast and dinner which arrangement continued even after this suit and a divorce action were instituted. Mr. Booth spent parts or all of many evenings at the home of defendant where she lived with her mother and when plaintiff made her last visit to Dayton, she saw her husband at the home of defendant several times.

The plaintiff was quite ill in October, 1942, necessitating a surgical operation. Her husband returned to their home, took her to the hospital in Chicago and attended her faithfully during her stay there and drove her to their home when she left. During this sickness and while Mr. Booth was in Chicago, defendant had occasion to make a business trip there with her employer, Mr. Elder. They were quartered at the Morrison Hotel. On this occasion Mr. Booth visited defendant and dined with her and Mr. Elder and they arranged for her to return to Dayton with him in his automobile which she did. The record is fully developed as to this and other events and it may be fairly stated that there is no proof of any illicit relations between Mr. Booth and defendant at any time. Mr. Booth told his wife nothing about his association with the defendant, nor about her return to Dayton with him from Chicago, but wrote to her giving an account at variance with his testimony at to what actually occurred. Mr. Booth did not return to their home at Glencoe after his visit to Chicago when he and the defendant returned to Dayton by automobile.

On January 3, 1943, Mr. Booth notified his wife by letter that he no longer loved her and instructed her to get in touch with a friend to work out the "mechanics of the situation". Plaintiff attempted a reconciliation by correspondence and later came to Dayton October 24, 1943, where she and her husband had several meetings at the last of which, it is testified by plaintiff, Mr. Booth indicated a purpose to return to her. This intention was changed the next day after he had gone to the apartment of defendant and talked to her after which he communicated his change of mind to plaintiff by 'phone from the apartment of defendant.

Mr. Booth insists that when he first left his home to come to Dayton he no longer had affection for plaintiff; that this condition had been cumulatively brought about by the refusal of plaintiff to bear children although it had been definitely agreed before their marriage this was to be done; by plaintiff's continual complaint about her state of health, largely fanciful; by her assumption of a superior attitude toward him because he was an inventor and she had money and because of her attempted interference with his profession. All of these defenses together with the claim of the plaintiff were developed at great length and the issues submitted to the jury.

Upon this appeal we must give that construction to the facts which is most favorable to the support of the verdict and judgment. So doing, many logical inferences may be drawn to refute Mr. Booth's testimony as to his state of affection for his wife.

It reasonably appears that plaintiff had been a faithful, dependable, industrious and co-operative wife. The fact that she had she had access to money was the one factor which no doubt, made possible that Mr. Booth carry on his experiments. Whether or not the failure to bear children was the fault of the plaintiff is in doubt; that she was obnoxious in stressing the difference in their financial resources does not project clearly from this record. More persuasive than all of these permissible inferences is the tenor and purport of the letter itself, of January 3, 1943, which Mr. Booth wrote to his wife indicating a purpose to sever their marital relations. This is the language—

"You may recall that a long time ago I promised that **if ever the time came** that I didn't love you any more I would tell you so. I have taken a long time to think it over, and **now know that this is true.**"

The emphasized portion of the letter permits the interpretation that the conclusion stated had only been reached at about the time the letter was written. Mr. Booth says that he put off the notification contained in the letter to his wife until it could be done with the least shock to her. But the time selected for the notice was not propitious because his wife was still suffering from the after affects of her operation.

The jury could reasonably have concluded that no one of the reasons assigned by the husband to account for the alienation of his affections for his wife satisfactorily explained it.

When Mr. Booth was in attendance on his wife at the time of her hospitalization and when he made his last visit to her, there was no intimation of any change in his regard for her.

It is insisted that the association of Mr. Booth with the defendant was but social; that there were no immoral re-lations and no evidence of love manifested between them. The relation may have been nothing more than as characterized by the defendant "a lovely friendship". Even so, the test as to the right of the plaintiff to recover is whether or not the defendant, by her conduct, intentionally accomplished the alienation of the affections of plaintiff's husband. It is not necessary in Ohio to support the action that adulterous re-lations appear although it is in some states.

### THE CHARGE OF THE COURT

The court in its general charge in stating the elements of the cause of action pleaded permitted the jury to consider two aspects, (1), whether or not the acts and conduct of the de-fendant caused plaintiff to lose the affection of her husband or, (2), prevented plaintiff from regaining her husband's affection. The court throughout the charge carried this two fold theory of the factual questions presented to the jury for consideration.

It is urged by the appellant that that portion of the charge which permitted the jury to consider whether or not the acts of the defendant prevented plaintiff from regaining her hus-band's affection is a departure in the law unsupported by a "single authoritative decision in the State of Ohio" that the "charge abrogates the general law in that:

1. It presumes a prior cessation of affection.

2. It reaches to the elements of re-establishment of affect-ions already lost, * * *, etc."

An examination of the Ohio cases supports the claim of appellant that in no case has the trial court charged the jury in the manner and by the exact terms employed in the charge here under consideration.

It is commonly accepted that in an action for alienation of affections, if it appear that there is no affection to alien-ate, recovery may not be had. However, a little nicer analysis of the factual situation is convincing that there is nothing revolutionary or unjustified by prior adjudication in the principle announced in the language of the charge.

Normally a husband and wife so long as they maintain that relation have affection one for the other and there is a presumption in law that such affection attends. 42 C. J. S. 332. When then affection has been temporarily alienated, there

is always the possibility so long as the relation of husband and wife maintains, that it will be resumed and if a third person by malicious conduct prevents the return of that affection when it fairly appears that it would have occurred but for said acts, that person must respond in damages.

This case presents factually the question of the correctness of the charge because of the testimony of the plaintiff that her husband, who prior to that time may have had his affection for her alienated by the defendant, after a conference had agreed with his wife to a resumption of the normal marriage relation but that this attitude of mind was changed after he had met with and talked to the defendant relative to the subject matter of the conference.

In the American Law Institute's Restatement of Law of Torts, Par. 691, at page 488, the principle is recognized that an element of proof is not only the inducing of a spouse to separate from the other spouse but also the inducing of the spouse not to return to the other. The charge as given, in our judgment, did not project into the case any new principle of law but merely separated into two parts that which would have been included in a general statement that if affection at any time existed between the husband and the plaintiff which by the malicious acts of the defendant was alienated, the plaintiff is entitled to recover.

## PUNITIVE DAMAGES

It is next urged that the court erred in charging on punitive damages for the reason that there is no proof from which an inference may be properly drawn of actual malice on the part of the defendant.

The defendant testifies that soon after she met Mr. Booth she learned that he was a married man but that he informed her that his wife was estranged from him. If this statement was made to her it does not appear that she took any other steps to determine whether it was true and in her association thereafter with Mr. Booth she must rely upon that one assertion only. Legal malice may be assumed if it appear that by reason of the acts of the defendant the affections of the husband were alienated from the plaintiff. **Westlake v Westlake, 38 Oh St 635;** Brison v McKellop, (Okla.) 138 Pac. 155, citing Elliott on Evidence, Vol. 3, Paragraph 1643; Bresch v. Wolf, (Mich) 220 N. W. 738; Allard v LaPlain, (Wash.) 266 Pac. 688, 6th syllabus. This principle, as we understand it, is not challenged but it is urged that to support an award of punitive damages actual or overt malice must appear and that there is no proof from which such an inference may be drawn.

We refer to one factual development which, in our judgment, will support an inference of express malice, viz: the conduct of the defendant after she must have known that the plaintiff was claiming that she was responsible for alienating her husband's affections. This was made known to the defendant during the final visit of plaintiff to Dayton, prior to, and at the time of plaintiff's institution of this action against her. Notwithstanding this information, she chose to continue her association with Mr. Booth as it was carried on before. With such knowledge she was put on notice that at least it was the claim of the wife that defendant's conduct had brought about the separation. When she persisted, the jury might properly find that such conduct was malicious in the sense required to justify an award of exemplary or punitive damages.

### CHARGE AS TO CONTRIBUTORY CAUSE

It is also objected that the court in its general charge, among other things, said—

"Or, if you find by a preponderance or greater weight of the evidence that defendant's acts and conduct, taken in conjunction with the acts and conduct of plaintiff or the acts and conduct of Harry Booth, or both, **contributed** to alienate the affections of Harry Booth from plaintiff, * * * then you must return a verdict for plaintiff in some amount * * *." (Emphasis ours).

The language of the charge is supported by 42 C. J. S. 319 and certain cases there cited, namely, Plourd v Jarvis, (Me.) 58 Atl. 774; Sullivan v Valiquette, (Colo.) 180 Pac. 91; Dunbier v Mengequedoht, (Neb.) 230 N. W. 669.

### VERDICT CAUSED BY PASSION AND PREJUDICE

It is urged that the verdict was stimulated by passion and prejudice; that the jury was made up of women only; that the charge of the court on punitive damages invited the full prejudice of the jury.

We have discussed the propriety of the charge as to punitive damages. The fact that the jury was comprised of women does not in itself suggest susceptibility to passion and prejudice. A reading of this record is convincing that the trial was conducted by the court and counsel in an orderly and well poised manner and the witnesses, to a marked degree, testified without acrimony or feeling. Nothing occurred in the presence of the jury which we may properly consider that would support the claim that it acted under the influence of

passion of prejudice unless it would be the amount of the verdict itself and we do not so find.

The constituent elements of damage to the plaintiff, loss of affections, society, companionship, mental suffering and distress, were of considerable magnitude. The first steady lucrative employment which Mr. Booth ever held, the jury may have believed, was made possible only by the assistance, financial and otherwise, which his wife gave him during twenty-five years of their married life. The Booths had reached the place when the wife could have fully enjoyed the consortium of her husband. If, by the act of the defendant, this assurance was taken from the plaintiff, she lost much of worth and the jury had the right to exercise its discretion as to its fair value in money. We cannot say that the verdict in the sum originally returned of itself indicated passion and prejudice and certainly the amount of the judgment as entered does not require such conclusion.

## MISCONDUCT OF COUNSEL

It is urged that in argument to the jury, counsel for the plaintiff stated that the plaintiff would have been justified in killing the defendant and Booth. This alleged statement does not appear in the bill of exceptions and is attempted to be brought into the record only by affidavit in support of a ground of the motion for new trial. To consider these affidavits would be going beyond the record which we are not permitted to do. **Simes v Dayton-Xenia Ry. Co., 24 Abs. 595.**

## ADMISSION OF EVIDENCE

It is assigned that the court erred in the admission of evidence objected to by defendant and attention is particularly directed to the admission in the testimony of plaintiff the statement that her husband made to her on the morning that he telephoned to her from defendant's apartment. This statement was to the effect that the husband said to his wife "Ruth (the defendant) says she loves me too much and I can't give her up". It is urged that this did not show state of mind of the husband but was merely a hearsay statement of what defendant was purported to have said and was clearly incompetent. An examination of the record discloses that when the question was propounded which would have elicited the testimony heretofore stated, objection was interposed and the court refused to permit the question to be answered. The answer was then proffered for the record only. Record, Page 135. Later when Mr. Booth on cross-examination and plaintiff on rebuttal were interrogated respecting the claimed statement of defendant, they were permitted to answer without objection. Record, Pages 580, 581, 736.

Upon careful consideration of all the errors assigned, we find none established which prejudiced the defendant in her right to a fair trial of the issues joined.

The judgment will be affirmed.

MILLER and WISEMAN, JJ., concur.